# The First Pennsylvania Banking and Trust Company v. Samuels

*Paul A. Davis, IV*, for plaintiff.

*Knox Henderson*, for defendants.

DITTER, J., December 31, 1964.—This case comes before the court on a petition to open a confessed judgment.

In response to defendants' petition, plaintiff filed an answer, raising certain questions of fact. Depositions were taken, briefs filed, and argument heard by the court en banc.

In November, 1960, defendant Daniel J. Samuels and one Eliadoro Cicalese were the owners of ReBar Steel Service Corporation, a subcontractor of construction work.

Requiring funds for the operation of its business, ReBar applied to plaintiff for a loan of $21,000. Its application, on a form prescribed by plaintiff, was dated October 11, 1960, referred to Samuels and Cicalese as "principals," gave a history of the business and the plans for using the proceeds of the loan, and recited a detailed account of Samuels' business experience.

On November 9, 1960, the loan was made and the following documents were executed:

(a) A business loan agreement, under the terms of which ReBar was to execute a note for $22,998.24, $21,000 plus interest and charges to be repaid in 36 monthly installments of $636.84.

(b) An instalment note requiring the repayment of $22,998.24 in 36 monthly installments. Although this note was executed by the Cicaleses and defendants as makers, it is admitted they were actually sureties for the corporation, ReBar.

(c) A one-day judgment note, which was signed by Samuels and his wife, Claire, in the amount of $21,000, this note to constitute the individual guarantees of the Samuels for the loan in question.

(d) A similar one-day judgment note by the Cicaleses, constituting their individual guarantees.

On December 21, 1960, judgment was entered on the Samuels' one-day judgment note in order to secure a lien upon their real estate in Montgomery County. At or about the same time, the note executed by Mr. and Mrs. Cicalese was entered of record in Philadelphia County, thus securing a lien against real estate owned by them.

On December 19, 1961, that is, approximately 13 months after the original loan, ReBar signed another note in favor of plaintiff. This was a promissory note in the amount of $41,383.01, and there is no indication that Claire Samuels knew of its execution. It is acknowledged that payments were made against the in-

stallment note of November 9, 1960, and the promissory note, that is the note dated December 19, 1961. However, default occurred in both, and the total claimed by plaintiff against ReBar is $44,087.96. ReBar's assets having proven insufficient to pay this amount, plaintiff liquidated the other collateral it held and obtained a net of $7,200 from the Cicaleses on the basis of their individual one-day judgment note and seeks to enforce a further claim against the Samuels based on their one-day judgment note.

Damages were assessed against defendants on February 27, 1963, in the amount of $24,944.50, that is, the principal of the one-day judgment note, $21,000 plus interest and attorneys' commission. Execution against the real estate of the Samuels was ordered and thereafter the petition to open judgment was filed.

As a result of the present pleadings, there are three principal issues before the court:

1. Did the one-day judgment note executed by defendants guarantee only ReBar's installment note dated November 9, 1960, or also guarantee ReBar's promissory note dated December 19, 1961?

2. To which of these loans should various sums realized from the liquidation of collateral be applied?

3. Was there a pro tanto release of the Samuels by the release executed in favor of the Cicaleses?

The agreement among the parties for the repayment of the money advanced on November 9, 1960, is to be found in the instruments executed on that date. In accordance with the general doctrine of the law of contracts, notes and contemporaneous written agreements executed as a part of the same transaction are to be construed together as forming one contract: Freeman v. Lawton, 353 Pa. 613 (1946). The instruments that are relevant to the present controversy are the business loan agreement, ReBar's installment note, which is the basic promise to repay, and Samuels' one-day judgment

note which is, in effect, the individual guarantee of the Samuels. The business loan agreement makes specific reference to ReBar's installment note and ReBar's installment note makes specific reference to the business loan agreement and to the Samuels' one-day judgment note.

Any liability to be imposed upon the Samuels individually as to other monies advanced by the bank to ReBar must come from these same instruments. The agreement of the Samuels to be sureties must be strictly construed. Their responsibility cannot be extended by implication. An additional liability, which their contract does not clearly show to have been within the reasonable contemplation of the parties on November 9, 1960, cannot be imposed upon them by the subsequent action of ReBar or the bank: Nicholas' Liquor License Case, 131 Pa. Superior Ct. 330 (1938). The fact that one of the individual guarantors was financially interested in the principal debtor does not change these rules of interpretation: Barratt v. Greenfield, 137 Pa. Superior Ct. 310 (1939).

Defendants contend that the documents in question show that Claire Samuels was lending her credit to the corporation, ReBar, for the purposes of a single loan, as distinguished from all future advances which might be made to it by plaintiff. We agree that an examination of the instrument bears her out, as do the depositions.

The business loan agreement makes constant references indicating that a single loan was contemplated. In this agreement, ReBar applied for "a loan" to be evidenced by "a note" and in consideration of the bank's granting "said loan", ReBar makes certain warranties and representations. ReBar agrees that the proceeds of "the loan" will be used for business purposes, and that as security for "the loan" it will de-

liver collateral, which includes "the personal guarantees of both of the principals and their wives."

ReBar goes on to covenant and warrant that it will inform the bank of any litigation which might prejudice repayment of "the loan" and agrees not to borrow other money while "the loan" remains unpaid. The loan agreement is to continue as long as "the loan or any part thereof or a renewal or extension thereof remains unpaid" and the failure to pay any portion of "the loan" when due shall permit acceleration.

The "note" to which reference is made is plainly ReBar's installment note, the note of November 9, 1960. It makes specific reference to the loan agreement. "The Terms of any loan agreement relating to the liabilities of debtor secured by the collateral are incorporated herein with the same force and effect as though the warranty, the covenants, and agreements thereof were fully set forth herein." In addition, ReBar's installment note provides that if any information furnished in the loan agreement is false and misleading, or if there is a failure to perform any of the provisions of the loan agreement, it shall constitute a default under the terms of the installment note.

The business loan agreement and ReBar's installment note are both for $22,998.24 [$21,000 plus interest] and Samuels' one-day judgment note is for $21,000 plus interest. If we construe these instruments together, bearing in mind that the loan agreement is to continue in effect until the loan is repaid, it is apparent that one loan of $21,000 was contemplated.

Plaintiff denies that this interpretation should be given to the instruments, and contends that such an interpretation is without significance in any event.

Plaintiff first points out that the Samuels' did not sign the business loan agreement and contends that therefore they have no rights under it. Although it is true that they did not execute it, the business loan

agreement refers to Daniel Samuels, as one of "the principals," and obviously could confer certain rights or privileges upon them. Contracts frequently refer to persons who are not signatories.

Next the bank argues that the business loan agreement states that nothing contained in it "shall prevent said note from being enforced in accordance with its provisions." The clause is not applicable to the present issues. Judgment was not entered on ReBar's installment note. The loan to ReBar of which the installment note is evidence represents only a part of the claim made against the defendants. The basis of *this* action is Samuels' one-day judgment note. Plaintiff is trying to enforce *it*, not ReBar's installment note. Plaintiff is attempting to collect a balance allegedly due from two different sources, ReBar's installment note of November 9, 1960, and ReBar's promissory note of December 19, 1961, by an application of the collateral obtained when the first loan was granted. Plaintiff wants us to ignore the language of the loan agreement and the obvious intention which it reflects. We cannot do so.

The business loan agreement constituted an integral part of the whole transaction of November 9, 1960, and we cannot be oblivious to the limiting effect of its language. It indicates that the parties had in mind one loan and only one.

Plaintiff next refers to this sentence in ReBar's installment note: "Debtor agrees that the collateral shall secure all liabilities due and to become due or which may be hereafter contracted, primary, secondary, contingent, joint or several, of each debtor and/or of each debtor and others to bank."

Literally, this says that no matter what ReBar might thereafter borrow, no matter what liability either or both of the Cicaleses might incur, or no matter what debt either of them might acquire with unknown per-

sons, the bank could look to Mr. and Mrs. Samuels for payment. The language contains no limitation as to time, amount, or purpose. For business or pleasure, better or worse, whether with friend or foe, if ReBar or either of the Cicaleses is liable, the bank contends that Samuels must make good.

Applied to the facts before us, the bank contends that if a married woman has agreed to act as a surety for a loan of $21,000, she can be held to that same extent on a loan made a year later for roughly twice that amount. So long as the installment note remains in existence, the plaintiff claims the right to apply the collateral, including the one-day judgment note, where-ever it will do plaintiff the most good.

There are three reasons why the quoted provisions of the note may not be given the all-encompassing interpretation urged in its favor by the bank. The first reason deals with the character of the installment note itself, the second with the relationship between the installment note and the business loan agreement and the third with the nature of Claire Samuels' legal liability.

The complex, wholesale provisions of the installment note are contained in small, closely-spaced print. Its lines are long and difficult to follow.[1] If Little Red Riding Hood was composed typographically as is this note it would be an intellectual challenge. The instrument has no headings to invite attention to particular parts, no grouping of paragraphs or arranging by sections, and no changes in type style to make de-

---

[1] Like the Philadelphia telephone book, it has 12 lines to the inch. Unlike the telephone book, each line is more than seven inches wide and contains an average of 24 words. By contrast the official reports of the Supreme Court of Pennsylvania have only six lines to the inch, each line is four inches wide, and each averages between eight and nine words. For further contrast, see rule 43 of the Supreme Court as to the requirements for briefs.

ciphering easier. It confuses the eye, curbs comprehension, and obstructs analysis. In short, it is arranged to conceal its provisions rather than portray them.

"Judicial protection against nonfraudulent but oppressive agreements has deep roots." [2] Courts have noted the effect of using small print in a "long and formidable" document with salient provisions located so as to escape attention, particularly where the parties are of unequal commercial experience. [3]

The following sentences pertain to a purchaser of personal property and contract forms prepared by a seller. The equitable concepts involved refer equally well to a borrower and the loan forms prepared by a bank.

"It is most significant that the vast majority of these cases involve form contracts in which the crucial provision is printed in type sufficiently minute to deemphasize its importance and discourage a careful reading. This does not mean, of course, that the presence of a printed form contract per se determines the outcome; it does indicate that the vast majority of such 'agreements' occur in circumstances inimical to genuine dickering over certain printed clauses. When handed a printed form to sign, the buyer will ordinarily concern himself only with the provisions to be filled in—those for which he has actually bargained—and will overlook or ignore the clauses governing the remedies available to him in the event the merchandise proves defective. To the ordinary customer, the filled-in terms constitute the transaction. Even if the deceptively termed 'warranty' or the printed 'waiver' were expressly called to his attention, it could hardly be supposed that he would be made cognizant of what

---

[2] Unconscionable Contracts Under the Uniform Commercial Code, 109 U. of Pa. L. Rev. 401, 406 (1961).

[3] Id. at 409.

he is sacrificing. The chances are remote indeed that a buyer, quickly skimming the fine print, will test the meaning of the clause (if it means anything at all to him) in the context of potential fact situations. Will he realize that the 'warranty' seeks to preclude recovery for personal injuries if his new automobile should suddenly veer off the highway into a wall? Something more than simply referring a customer to legalisms in a printed form must be done to inform him of his rights—or lack of them—under the contract." [4]

Whatever disposition the installment note might receive were it flying solo, here this carefully contrived craft cruises in formation with the business loan agreement. It is worth noting that this latter document is printed to be read, and perhaps even understood. Its face is well-spaced and even the warranties and conditions on the reverse side are set forth in legible fashion.[5] As we have previously observed, the business loan agreement indicates that there is to be *a* loan and that the one-day judgment note is to be a part of the collateral for *it*, not for a series of loans. On the other hand, the installment note provides an exquisite variety of the application of its collateral. Whether we say that the two instruments are contradictory or merely mismatched, we are unable to state, as a matter of law, that the bank is justified in using the judgment note obtained to protect one loan for the collection of another made a year later.

The third reason why the language in question cannot carry the day results from the relationship between the parties. Claire Samuels, an uncompensated surety, is a favorite of the law.

---

[4] Id. at 412.

[5] Lettered paragraphs, six lines to the inch.

When read together, the provisions in the installment note and business loan agreement are subject to two different interpretations, i.e., the collateral may be applied to one loan or more than one loan. The provisions of these instruments are to be interpreted against their author, the bank, and in favor of the uncompensated sureties whose liability is *strictissimi juris*. A creditor must always deal with a surety in fairness and good faith: First National Bank v. Stolar, 130 Pa. Superior Ct. 480 (1938). To allow the bank to apply collateral as it sees fit and to refuse to hear what limitations may have been contemplated by the surety would be to sanction possible overreaching and unconscionable conduct. Although a court may not relieve a party from the effect of an improvident contract, rigid literalness shall not be used to reach a result not intended: Mowry v. McWherter, 365 Pa. 232 (1950). If language used in the creation of a contract of suretyship is not free of doubt, the circumstances surrounding its creation and particularly the purpose for which it was given, should be taken into account: Manufacturers and Merchants Building & Loan Ass'n. v. Willey, 321 Pa. 340 (1936).

Good conscience and sound legal principles demand that the judgment be opened so that a defense may be presented.

There is another reason why the judgment must be opened. Plaintiff has applied amounts realized from the liquidation of collateral placed in its hands on November 9, 1960, as part of the original loan, to reduce the balance due on the promissory note of December 19, 1961. The moneys in question came from the sale of an automobile, from the proceeds of insurance on the life of Daniel I. Samuels, and from a payment made by the Cicaleses to obtain their release from the $21,000 one-day judgment note which they executed. We are of the opinion that some of these

amounts, at least, should have been used only to reduce ReBar's original installment note.

The Samuels and the Cicaleses had a common interest and a common burden as to the note executed on November 9, 1960. Thus, they were cosureties: Fidelity and Casualty Co. v. American Surety Co., 313 Pa. 145 (1933). In the absence of an agreement to the contrary, each had a right to look to the other for contribution. When each signed the note of November 9, 1960, each did so having the assurance that the other was assuming an equal share of the liability. Each had a right to require the bank to appropriate money realized from the collateral security to the debt that they were then guaranteeing: 35 P. L. Encyc. Suretyship §137; 10 C. J. S. 1041. See also First National Bank v. Stolar, supra, at page 487.

The note in no way destroyed their right to rely on these legal principles unless it did so in specfic terms. The liability of a surety is not to be extended by implication: Thommen v. Aldine Trust Co., 302 Pa. 409 (1931). The bank relies on three separate provisions of the note. The first is the blanket clause which states that all collateral must answer for all liabilities of all parties to the note. As we have said, this language is hobbled by that which is contained in the loan agreement and our sense of justice and we are unable to give the provision the free rein urged by plaintiff.

Plaintiff contends that the note empowers it, upon default, to apply the proceeds of the collateral "to pay the liabilities of each debtor to bank." This is true of "goods" (tangible personal property) which are sold. Thus the proceeds from the sale of the car were available for application to the other obligation of ReBar. This section of the installment note, however, contains no language broad enough to cover life insurance policies pledged to it nor to a judgment note which has

been accepted as collateral and upon which payment has been received. Agreements as to the disposition of pledged collateral are to be strictly construed: Rocco v. Peoples Nat'l. Bank of Ellwood, 150 Pa. Superior Ct. 348 (1942). If the bank actually sold the life insurance and the Cicalese note, as contrasted with applying for and receiving the cash surrender value of the insurance and a direct payment from the Cicaleses on the note, plaintiff may have been entitled to apply the net proceeds to the other obligation of ReBar. Its answer contains no averment as to which it did and we are left to speculate as to just what was done and whether it had the right to do so.

The bank's position is not enhanced by other language to which it directs our attention—the final part of the note which deals with the release and exchange of collateral. It says it had the right to release the Cicaleses and that its doing so did not release the Samuels. We agree, but that is not the issue. The question is whether or not it had the right to apply the money from the Cicaleses to the payment of another debt, thus prejudicing the Samuels, who were the cosureties of the Cicaleses. Since the note is silent in this regard, the bank lacked the authority to do so.

ORDER

And now, this 31st day of December, 1964, for the reasons set forth in the foregoing opinion, the defendants' petition is allowed and the prothonotary is directed to open the judgment entered on December 21, 1960.